IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **ESTATE OF JESSE C. JACOBS, JESSE R.** | § | |
| **JACOBS AND DIANE S. JACOBS,** | § | |
| **INDIVIDUALLY AND HEIRS OF THE** | § | |
| **ESTATE OF JESSE C. JACOBS, AND** | § | |
| **REPRESENTATIVE OF THE ESTATE OF** | § | |
| **JESSE C. JACOBS** | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | CIVIL ACTION NO.  3:16-cv-00065 |
| **v.** | § | **JURY DEMAND** |
| | § | |
| **GALVESTON COUNTY SHERIFF-HENRY** | § | |
| **ANDREW TROCHESSET, IN HIS** | § | |
| **INDIVIDUAL CAPACITY AND** | § | |
| **GALVESTON COUNTY, AND JOHN DOE** | § | |
| **GALVESTON COUNTY JAILERS 1-20,** | § | |
| **AND DR. LINEA MCNEEL, IN THEIR** | § | |
| **INDIVIDUAL CAPACITIES** | § | |
| **Defendants,** | | |

## SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Estate of Jesse C. Jacobs, Diane Jacobs, Jesse R. Jacobs, individually and heirs of the Estate of Jesse C. Jacobs as Wrongful Death Beneficiary and Survivors of Jesse R. Jacobs, Deceased and as Representative of the Estate of Jesse C. Jacobs, Decedent, Plaintiffs herein, complaining of Galveston County and Galveston County Sheriff, Henry Trochesset, John Doe Galveston County Jailers 1-20, and

acting under in her individual capacity and psychiatrist, Dr. Linea McNeel for cause of action would respectfully shows as follows:

## I. JURISDICTION AND VENUE

**A.**      This court has subject matter jurisdiction over claims brought under the Civil Rights Act of 1871 pursuant to 28 U.S.C. §§ 1331 and 28 U.S.C § 1343 (3) and (4), and 29 U.S. C. § 1367 and American Disability Act. As Amended (ADAA) and The Rehabilitation Act of 1973, as amended and Rehabilitation Act of 1973.

**B.**      Supplemental Jurisdiction over the state law claims is conferred by 28 U.S.C. §1367. An affidavit pursuant to Texas Rule Civ. Proc. 10(D)(2) is attached in support of the medical claims.   Venue is proper in this Division. The jurisdiction of this court is invoked to secure protection of and to redress deprivation of rights secured by the U.S. Constitution under the Fifth Amendment, Eight Amendment and Fourteenth Amendment of the U.S. Constitution, as made applicable to the States through the 14th Amendment, and by the Civil Rights Act of 1964, and  42 U.S.C §1983, § 1985, and §1988 ensuring due process, and providing for the equal protection and rights of all persons in every state and territory within the jurisdiction of the United States.

This Court has personal jurisdiction over parties because all of the parties reside or exist within the state of Texas.

**C.**     Venue properly lies in the Galveston Division of the Southern District of Texas

pursuant to the general venue statute 28 U.S. C. §1391(b)

## II. <u>SUMMARY OF THE CASE</u>

1.        Jesse C. Jacobs was the thirty-two-year-old, only child, of Jesse R. Jacobs and

Diane S. Jacobs. Jesse died as a result of the denial of medical care, failure and refusal

of Galveston County, Galveston County Sheriff, Jailers John Doe 1-20, Dr. Linea

McNeel, and Galveston County Jail healthcare providers to administer to Jesse his

physician prescribed, non-narcotic, DEA Schedule IV, Benzodiazepine,  Alprazolam

medication, despite having being under a physician's care for over a decade, with a

prescription of the medication, and his body developing a physical dependence on,

as clearly demonstrated by the severe withdrawal symptoms, including four

documented seizures, suffered by Jesse C. Jacobs.

2. Along with the Defendants, Galveston County, Galveston County Sheriff, Jailers

John Doe 1-20, and Dr. Linea McNeel's denial of medical care to Jesse Jacobs and

failure to provide Jesse C. Jacobs with adequate medical care, by administering his

alprazolam medication, for severe panic disorder, which his body became physically

dependent on, the Defendants failed to prevent, or reduce the severe withdrawal

symptoms including: heavy sweating, disorientation, heart palpitations, nausea,

panic, anxiety, elevated stroke level blood pressure, and terrible Grand Mal seizures

by administering to Jacobs his alprazolam. Jesse C. Jacobs suffered from withdrawal symptoms, as a result of the abrupt disruption of the, Benzodiazepine-Alprazolam medication that his body became physically dependent upon, and needed.

3.     The medical care in question was so needed by Jesse Jacobs  that its denial could not be supported by any competent recognized medical authority, that Jesse Jacobs had been suffering from a severe and obvious illness or injury at the time the medical treatment was not forthcoming, and that the denial itself was attributable to something more than simple negligence upon the part of the appropriate Galveston County Jail's physicians, nurses and EMT and Sheriff Trochesset who developed  the no Alprazolam policy. Jesse Jacobs asserts a claim for a denial of medical treatment and alternatively improper medical care and inadequate medical care and treatment.

4.     After, the withdrawal symptoms began to heavily manifest, neither Defendants, Galveston County, Galveston County Sheriff, nor Jailers John Doe 1-20, sought or secured emergency medical services for Jesse C. Jacobs. Neither defendants, Galveston County, Galveston County Sheriff, nor Jailers John Doe 1-20, reassigned his housing to the medical unit of the Galveston County Jail, K-Pod, but rather placed Jesse C. Jacobs in Solitary Confinement, FSP-Unit, where seven days later Jesse C. Jacobs was found, on the floor, unresponsive and without a pulse.

5.     The Galveston County, and Galveston County Sheriff Trochesset required the detoxification protocol action against inmates entering the jail facility by intake personnel, on a basis and standard of just "know[ing] it," or admission by an inmate

that they are on a substance, as Jesse did, without regard as to whether the inmate, such as Jesse Jacobs, was using the substance legally by prescription or not.

### III.   **NATURE OF THE CASE**

6.      This is a wrongful death action brought by the Plaintiffs, who are the Father, Mother, and heirs of Jesse Jacobs.  Pursuant to 42 U.S. C. §1983, § 1985, and  §1988 they are seeking recovery and redress for the serious infringements of Jesse Jacobs' rights causing his death and violations of the constitutionally-protected civil rights of Jesse Jacobs, decedent.  This is a denial of medical care case that requires federal court intervention.  See *Estelle v. Gamble*, 429 US 97, (1976) and *Armon v. Jones* 580 F. Supp 917 ( ND Texas 1983) and *Smith v. Dooley*  591, F. Supp 1157 ( WD La, 1984)

7.      Specifically, Plaintiffs allege that Galveston County, Galveston County

SheriffTrochesset, Jailers John Doe 1-20, and Dr. Linea McNeel violated Jesse Jacob's civil rights by denying medical care pursuant to the Fifth Amendment, Eighth Amendment and Fourteenth Amendment of the United States Constitution to be free from cruel and unusual punishment, to receive proper medical care, and to receive adequate medical care, while incarcerated and under the custody and control of Galveston County, and due process at the Galveston County Jail under the supervision and control of Galveston County, Galveston County Sheriff Henry Trochesset, Galveston County John Doe Jailers 1-20, Dr. Linea McNeel, and Galveston County Jail's Contracted Medical Providers.

7.  Specifically, Plaintiff asserts that psychiatrist, Dr. Linea McNeel acting under color of law violated Jesse Jacob's civil rights  by denying Jesse Jacobs medical care pursuant to the Fifth Amendment, Eighth Amendment and Fourteenth Amendment of the United States Constitution right to due process, to be free from cruel and unusual punishment, to receive proper medical care, and to receive adequate medical care, while incarcerated and under the custody and control of Galveston County, at the Galveston County Jail under the supervision and control of the Galveston County Sheriff, Galveston County John Doe Jailers 1-20 and Galveston County Jail's Contracted Medical Providers

## IV.    PARTIES AND SERVICE

8.     Jesse R. Jacobs and Diane Jacobs bring this suit individually and as heirs and representative of the Estate of Jesse C. Jacobs. Diane and Jesse R. Jacobs are the parents of Jesse C. Jacobs, their only child.

9.     Jesse C. Jacobs, the decedent, was at all times a citizen of the United States and died intestate. This lawsuit is brought by Jesse R.  Jacobs as representative of the Estate of Jesse C. Jacobs pursuant to Texas Probate Code.

10.     Jesse died in Galveston County.  Jesse R. Jacobs was appointed administrator of the Estate of Jesse C. Jacobs in August 2015.  He brings this action both in his individual and fiduciary capacities.

**A.     Plaintiff, Diane L. Jacobs**, brings this wrongful-death action as the mother of Jesse C. Jacobs, decedent.

**B.**     **Plaintiff, Jesse R. Jacobs**, brings this wrongful-death action as the father of

Jesse C. Jacobs , decedent and Representative of the Estate of Jesse Jacobs

**C.**     **Plaintiff, Estate of Jesse C. Jacobs** brings this action on behalf of Jesse Jacobs,

the decedent.

**D.**     **Plaintiff, Heirs of Jesse C. Jacobs,** brings this wrongful-death action as the

heirs of Jesse C. Jacobs, decedent.

**E.**     **Defendant, Dr. Linea McNeel** was at all times relevant to this action a

psychiatrists working in the Galveston County, Texas Jail.  She was employed as a

contractor.  Dr.  McNeel is being sued in her individual capacity, acting under color of

law.  She may be served at 1913 Driftwood Ln Galveston, TX 77551.

**F.**     **Defendant, Sheriff Henry  Trochesset** is and was at all times relevant to this

action the duly elected Sheriff of Galveston County Texas. He is employed by

Galveston County as a Sheriff of the Galveston County Sheriff's

office.

10.     Sheriff Trochesset is sued in his individual capacity, acting under color of law.

Sheriff Trochesset is a person under 42 U.S.C. § 1983 and at all times relevant to this

case acted under color of law.

11.     He is a county policy maker with respect to policies and procedures at the

Galveston County Jail.   He may be served with process at his home[redacted]; or in

the alternative, at Galveston County Sheriff's Office 601 54th Street Galveston, Texas 77551.

F.     Defendant, Galveston County is a unit of local government organized under the laws of the State of Texas.  Defendant under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Galveston County may be served with process by serving the County Judge of Galveston County, Mark Henry, at 722 Moody Avenue 21 Street, Galveston, Texas 77550.

G.     **Defendant, Galveston County Jailers John Doe # 1-20** are employed by Galveston County as Jailers of the Galveston County. John Doe Jailers # 1-20 are sued in their "personal or individual capacity, acting under color of law."

12.     They demonstrated deliberate indifference to the serious medical needs of Jesse Jacobs and who will be served with process after they are identified.

## V.   FACTUAL BACKGROUND

### A.     Jesse C. Jacobs' background

13.     Jesse C. Jacobs was born in El Paso, Texas and was the only child of Diane and Jesse C. Jacobs, and the only grandchild in the Jacobs' lineage. He is survived by each and every one of his grandparents, parents, aunts, uncles, and cousins.

14.    Jesse C. Jacobs was a single male with many hopes and aspirations for his future, after ending a long term eight-year relationship. He was a recent graduate of the University of Houston main campus, earning his Bachelor's degree, and was scheduled to start a new job after his release, creating computer applications.

15.    He had overcome setbacks due to his longtime battle with severe panic disorder and other medical conditions.  Jesse C. Jacobs suffered from severe panic disorder, and depression, which are mental health issues.

16.    On February 10, 2015, Jesse C. Jacobs waived a trial by jury and pled guilty to his second DWI in ten years, and agreed to serve a thirty (30) day sentence, in an effort to take personal responsibility for his actions, and move on with his life.

17.    It was likely that he would serve no more than twelve (12) days of his thirty (30) day sentence, due to jail credits, overcrowding, and good behavior.  At the time of his sentencing, Jesse Jacobs was 32 years old.

18.    He was 5'10" tall and weighed approximately 250 pounds.  He loved his parents, extended family, and friends; he had every intention of securing release from jail and resuming his family life and embarking on a new career awaiting him upon his release.

19.    On Friday, March 6, 2015, Jesse Jacobs entered the jail after sentencing and promptly informed intake of his diagnosed health conditions, including severe panic disorder, and that he was prescribed and had been taking the non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam for over ten years for his severe panic disorder and anxiety.

20.     Jesse presented full bottles of his prescriptions, with pills and a letter from his treating physician, Dr. Don LaGrone, indicating it was "imperative" that he take the medications, through is mother. (See Exhibit 1-*Letter from Dr. LaGrone* and Exhibit 2-*prescriptions*).

21.     An jail emergency medical technician (EMT) indicated to Jesse Jacobs' mother he would not be given his prescribed non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam, while in custody, upon presentation of the prescriptions, but he would check on it, and if Jesse C. Jacobs were allowed to receive his medication, he would receive it. The prescriptions were collected and inventoried by Galveston County Jail staff EMT. (See Exhibit 3- *Galveston County Jail Intake Medical Inventory receipt*).

22.     There is no disagreement that the Galveston County Sheriff has a policy that non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam cannot be used in the jail, whether for therapeutic purposes or recreational.

23.     There is also no disagreement that Jesse was denied the, non-narcotic, Alprazolam medication, which he had been prescribed and had been taking for over a decade to treat a severe panic disorder by the acts of Sheriff Trochesset, Dr. McNeel, Dr. Faust, Dr. Becker, Nurse Kathy White, and each and every Galveston County Jail medical personnel.  Along with treating his severe panic disorder, his body had become physically dependent upon the medication.  According to the jail medical records, Jacobs suffered his first documented seizure after his fourth day in custody, Tuesday March 10, 2015 at 16:00 (4:00pm).

24.     Jesse Jacobs' primary doctor, Dr. Don LaGrone, and Jesse Jacobs himself, indicated that Jesse had no history of seizures. Sudden cessation of Alprazolam is highly dangerous, and was widely known at the time that abrupt disruption of Alprazolam discontinuation to lead to seizures, and many other dangerous side effects.

25.     At the time that Jesse C. Jacobs was denied his Alprazolam medication the risk of harm was well known and it is accepted that if a patient has been on the, non-narcotic, Alprazolam for an extended period of time and the DEA schedule IV, and the Alprazolam medication is discontinued, then the patient is subject to physical dependence, severe withdrawal symptoms including becoming diaphoretic, and experience disorientation, palpitations, nausea, panic, anxiety, terrible seizures, and death.

26.     These known and foreseeable symptoms are routinely avoided by tapering the patient off of the medication, under close physician supervision, preferably in a hospital setting.  Each of the above detailed symptoms were documented symptoms that Jesse suffered in the Galveston County Jail, leading to his death.

27.     Jesse was never tapered off of the non-narcotic, DEA Schedule IV Benzodiazepine-Alprazolam medication by medical staff including by psychiatrist Dr. Linea McNeel, and Dr. Harry L. Faust, and General Physician Dr. Becker, but abruptly discontinued from his Alprazolam medication; nor, was he placed on a substitute for the benzodiazepine, until his sixth day in custody, Librium, which failed to be

administered as prescribed, and the substitute prescription failed to reduce his withdrawal symptoms.

28.     Further Jess was left alone, in solitary confinement, without close physician, psychiatric, or medical supervision including from Dr. Linea McNeel.

29.     The physicians, psychiatrist and healthcare providers, Galveston County Sheriff, and Jailers, acting on behalf of Galveston county, made the decision to deny medical care by terminating Jesse Jacobs's non-narcotic, DEA Schedule IV Benzodiazepine Alprazolam medication regimen without any tapering, or contacting his primary physician, Dr. LaGrone, to inquire about Jesse's medical history and failed to prevent, properly recognize, diagnosis or properly treat his Benzodiazepine Alprazolam withdrawals symptoms resulting in the medical crisis, including failing to adequately respond to the four known and documented seizures that Jacobs suffered in the Galveston County Jail, but instead assaulted Jesse, with ammonia caps, to make sure he was not faking first, then after determining the seizure was not a pseudo-seizure, but a genuine, true, Grand Mal seizure, Jesse was then treated with Gatorade, and water.

30.     While in the custody, care and control of the Galveston County Jail, Jesse C. Jacobs suffered profuse sweating, disorientation, palpitations, nausea, panic, anxiety, vomiting, diarrhea, as well as other symptoms, and at least four, if not more, terrible seizures day after day without ever receiving any emergency medical attention. Although Jesse was suffering from severe vomiting, diarrhea, and other symptoms, along with the seizures, until his seventh and final day in the Galveston County Jail,

when he was found on the cement floor of his solitary confinement, FSP, jail cell unresponsive, drooling, without a pulse, surrounded by his own feces, there remained a denial of medical treatment, not limited the deprival of his alprazolam.

31.     Emergency Medical Services (EMS) was summoned for the first time, on Jesse's seventh day in custody, and four days after his first seizure. He was then taken to The University of Texas-Medical Branch (UTMB) in Galveston hospital. When he arrived his prognosis was "grim," he was critically ill, and he was pronounced dead the next day. He was falsely described as a patient that "abused Xanax" to the Hospital, upon admittance, which likely impeded the opportunity of immediate adequate care, and possible IV push of the liquid Alprazolam.   (See Exhibit 5- *UTMB Medical Records*).

32.     Galveston Sherriff Trochesset claimed Jesse's death was due to "natural causes," and the In Custody Jail Death Report created with content in violation of Texas Penal Code (See Exhibit 14 -*In Jail Custody Death report*).

33.     The Galveston County Medical Examiner determined Jesse Jacobs' cause of death to be "abrupt discontinuation of long term Alprazolam medication".   ( See Exhibit 7-*Death Certificate*).

34.    Jesse Jacobs died, because: (1) the Galveston County Sheriff Henry Trochesset implemented a policy to discontinue the administration of Alprazolam medication to any inmate that  enters the Galveston County Jail (2) the Galveston jail medical staff, including  psychiatrist, Dr. Linea McNeel,  allowed the discontinuation to continue and refused to administer his legally prescribed non-narcotic medication, (3) Dr. Linea McNeel, and Galveston jail medical staff failed to treat Jesse for four or more seizures, (4) Dr. Linea McNeel and Galveston jail staff ignored his medical complaints,  (5) the defendants failed to medically monitor him in accordance with Texas Jail Standards, (6) failed to provide medical treatment to him after abruptly discontinuing his long term four milligram dose  of Alprazolam, for  at least four day and once only treatment began, a treatment with a Librium, the treatment was ineffective and the seizures continued; and (6) had wanton disregard, and deliberate indifference for Jesse C. Jacobs' serious medical needs, by delaying medically necessary emergency medical treatment after Jesse's severe withdrawal symptoms, including his first, second, third, or fourth or more seizures, resulting in Jesse C. Jacobs' death.

35.    And there are no medical records of sick calls request, examinations, diagnoses, treatment or medications prescribed to Jesse to rebut these allegations. (See Exhibit 5- *Galveston County Jail Medical Records of Jesse Jacobs*)

36.     His surviving parents and heirs, Jesse R. Jacobs and Diane Lynn Jacobs, and the Estate of Jesse C. Jacobs bring this action seeking fair compensation, appropriate training with the hope that they can prevent other inmates and prisoners at the Galveston County Jail from suffering similar excruciating injuries and/or death, and acknowledgment from the Sheriff that their son died as a result of the Galveston County, Galveston County jail, Galveston County Sheriff's decision making, and policies.

**B.      Conditions at Galveston County Jail**

37.     On March 6, 2015, Galveston County Judge, John Grady, sentenced Jesse C. Jacobs to thirty (30) days in jail, and he immediately entered the Galveston County Jail, in Galveston, Texas.

38.     Upon intake, Jesse C. Jacobs was booked and moved to the medical intake department of the jail and his medical intake interview was conducted by an Emergency Medical Technician named Joe Lloreda.

39.     Jesse C. Jacobs promptly made EMT Lloreda the aware, at intake, that he had prescriptions. Prescriptions he had filled at his regular pharmacy, along with a letter from his primary physician, Dr. LaGrone, advising the jail staff of his ten-year prescription regimen and the fact that it was imperative that Jesse continue to take

his non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam and other prescriptions.

40.    Lloreda received, and inventoried the instructions, prescriptions, and pills. The instructions from Dr. La Grone were placed in Jesse Jacobs' jail medical record file.

41.    Lloreda advised Jesse C. Jacobs, his Mother, Diane Jacobs, and legal representative that Jesse would not be given his non-narcotic, DEA Schedule IV, Benzodiazepine- Alprazolam, while he was in the Galveston jail, because jail policy prohibits inmates from receiving Alprazolam, but he would accept the medication and if Jesse is approved to receive the Benzodiazepine-Alprazolam he would get it.

42.    Jesse called home the evening he turned himself in, on March 6, 2015, and advised his mother he was not being given his medication. Diane Jacobs called the jail notifying them that he needed his medication. A fact that EMT Lloreda stated would be the case upon receipt of the medication.  In fact, Galveston County Chief Deputy of Correction Mary Johnson told the media, regarding Jesse C. Jacobs death, "I do know some psych drugs and stuff they don't allow, some they won't prescribe."

43.    The Galveston County jail was cited six years ago for not dispensing medications ordered by a doctor.  The Galveston County EMT immediately placed Jesse Jacobs on a benzodiazepine detoxification protocol, without first contacting Jacob's prescribing primary care physician, Dr. Don LaGrone, Jesse's physician for over ten years, any other of Jesse Jacobs treating physicians, or any physicians at all.

44.    On March 6, 2015, Jesse C. Jacobs began his sentence in general population, B3 Pod, a unit for inmates that are usually older, or non-threatening.

45.    Medical records indicate that Dr. Harry Faust, Jr. was the first of the three jail physicians to treat Jesse Jacobs during his incarceration in the Galveston Jail.

46.    Harry L. Faust Jr. is a physician, and pharmacist that has been disciplined by the Texas Medical Board for instructing a former patient of his, who had been on a benzodiazepine for eight years to cease taking benzodiazepines, without adequate documentation to support the sudden cessation of this course of medication, just as he directed and encouraged the continuation of Jesse C. Jacobs sudden cessation of non-narcotic, DEA Schedule IV, Benzodiazepine-Alprazolam. Jesse C. Jacobs medical records indicate that Dr. Henry L. Faust did not examine Jesse C. Jacobs at all, or at minimum indicate that again another instance of Faust's failure to provide adequate documentation to support the sudden cessation of the Alprazolam. (See Exhibit 11- *Faust Suspension orders*)

47.    Jesse C.  Jacobs remained in general population B-3 Pod for four days until

March 10, 2015. On March 10, 2015, Jesse had a seizure in the Galveston County Jail. He was not transported to a hospital for emergency medical treatment and care, he remained in the general population unit.

48.     After Jesse had his second seizure, he was found lying on the floor of the B-3 unit, drooling.  Jesse was questioned if he had ever suffered a seizure before and he made them aware that he had not, yet Jesse still was not transported by Galveston County, Galveston County Sheriff or any medical personnel to a hospital for emergency medical care and treatment.

49.     Later that same day, for some unknown reason Jesse C. Jacobs's clothes were taken from him, and he was moved to full suicide protocol (FSP), also known as solitary confinement, "the hole," or "butt naked," instead of a medical unit or to a hospital. The temperature in the room was uncomfortably cold.   Jesse was not re-housed to FSP, because he was suicidal or due to suicide concerns. There was no documentation he was not moved to FSP for medical, nor disciplinary purposes.

50.     The Galveston County jail has a medical pod (K-Pod) with medical beds, but Jesse was never housed in that unit.

51.     Full suicide protocol (FSP) is a cement room with a raised cement a *slab* for sleeping, the room is without a toilet, sink, or shower, but only a drain in the cement floor of the room. FSP is often used for punitive purposes against unruly inmates, who leave insignias of their fury for being in FSP in the form of blood, feces, and urine, melted into the walls of FSP.

52.     Jesse C. Jacobs was moved to solitary confinement (FSP) between March 10, 2015 and March 11, 2015.  Jesse began suffering additional Benzodiazepine withdrawal symptoms of diarrhea, diaphoretic (heavy sweating), he was responding

verbally to questions, and was alert but confused, his pupils were dilated, along with

the seizures that resulted in his tongue being bitten through and heavy bleeding.

Jesse was left in this FSP cell with only a mattress, and a smock.

53.     Galveston County jail has a medical unit, but does not have an infirmary unit

to provide medical care and treatment for its inmates, as is customary. In fact the

Texas Administrative Code § 260.126 provides: "an infirmary should be provided for

facilities of 200 or more capacity". Galveston County has a capacity of 200 or more.

Section §273.1 requires: "The owner/operator of each facility shall provide medical,

mental, and dental services in accordance with the approved health services plan.

These services may include, but shall not be limited to, the services of a licensed

physician, professional and allied health personnel, hospital or similar services."

54.     Jesse Jacobs did not receive emergency medical services, care, or treatment

from Galveston County, Galveston's Sheriff Office, Galveston Jailers John Doe 1-20 or

EMT from March 6, 2015 until he was found unresponsive without a pulse.

55.     On March 13, 2015, Jesse Jacobs was found unresponsive in his jail cell, nude,

with his mattress covered in fecal matter as a result of his diarrhea, one of his

withdrawal symptoms.

56.     Texas Administrative Code Rule §275.1, requires Regular Observation be

performed at least every 30 minutes in areas where inmates known to be assaultive,

potentially suicidal, mentally ill, or who have demonstrated bizarre behavior while

confined, and there" shall be a two-way voice communication capability between

inmates and jailers, licensed peace officers, bailiffs, and designated staff at all times,

and closed circuit television may not be used in lieu of the required personal

observation" according to Texas Jail Standard requirements.

57.     Jesse was not, but should have been supervised face to face every thirty

minutes by the jailers, licensed peace officers, bailiffs, or designated staff, as a result

of his known and documented mental health status, and at least once an hour by jail

medical personnel due to his benzodiazepine detoxification orders; however,

medical records indicate that Jacobs was left unsupervised for more than 6 hours at

times.

58.     On April 21 and April 22, 2015 a little over a month after Jesse C. Jacobs's

death, Galveston County Jail was inspected by the Commission for Jail Standards and

according to the Inspection Requirement Review the Galveston County Jail was

provided with "technical assistance," as a result. That report, showed the jail failed to

comply with the jail standards for supervision of inmates. (See Exhibit 8, Jail

*Standards Report*)

## C. Jesse C. Jacobs's Prescription Medication

53.     Jesse C. Jacobs, as mentioned above, had been legally prescribed the

nonnarcotic, DEA Schedule IV, Benzodiazepine, Alprazolam by his physician, Dr. Don

LaGrone, a duly licensed well respected psychiatrist, to treat his severe panic

disorder for over a decade, leading up to Jesse C. Jacobs' 30-day sentence. Jesse C. Jacobs was prescribed two milligrams of Alprazolam to be taken three times daily, and one milligram in time release form.

54.     Not wanting his medication to be a problem for anyone, Jesse came to jail prepared. He and his well renowned psychiatrist of over ten years, Dr. Don LaGrone successfully managed his severe anxiety with a careful balance of medications, including the benzodiazepine, Alprazolam.

55.     When Jacobs reported for his sentence, Jesse made the medical intake personnel aware that he was under a psychiatrist's care and prescribed Alprazolam for his panic disorder and anxiety. Jesse provided the physical paper prescription, a filled prescription with pills in the bottle, and a letter from his physician, psychiatrist. The medication was inventoried and the medication bottle was documented to contain 60 prescribed 1mg Alprazolam extended pills, and 90 prescribed 2mg Alprazolam pills, the written prescription, and a letter from his prescribing Physician. (See Exhibit 2-*Alprazolam Prescriptions*)

## D. Jesse C. Jacobs's Experience at the Galveston County Jail

56.     Although, Jesse brought his prescribed Alprazolam medication, with him to the Jail. Joe Lloreda an EMT the person who conducted Jacobs' intake medical screening entered a written statement that the jail was "unable to verify" his prescriptions for Alprazolam, as well as, other medications for chronic conditions

like high blood pressure despite these preparations, and information.  (See Exhibit 4

-*Jail Intake Forms*)

57.    Instead of contacting any of his physicians, or the pharmacy, to verify the

prescriptions, or contacting the jail facility physician or allowing Jesse Jacobs to

continue his medication, the jail medical notes and records indicate that each

Galveston County staff and Galveston County medical intake personnel instituted

detoxification protocol, but instead held the medications locked away in the jail

facility.


58.    After the detoxification protocol was commenced by the EMT following the

Galveston County's encouraged policy and custom, Dr. Linea McNeel, and other

Galveston County Medical Doctors, Nurse Practitioners, Nurses, Paramedics, EMTs,

Galveston County Jailers, John Doe 1-20, jail staff, and Galveston Sheriff agents that

came into contact with Jesse continued to refuse Jesse Jacobs his prescribed

medications.

59.    Within hours of the detoxification protocol, Jacobs began manifesting

symptoms of acute benzodiazepine physical withdrawal symptoms and his blood

pressure soared. (See Exhibit 5 - *Galveston County Jail Medical Records*)

60.    At no time from the moment Jacobs entered the Jail until his death eight days

later did Defendants, Galveston County its agents, employees, representatives, Dr.

Linea McNeel, other Galveston County Medical Doctors, Nurse Practitioners, Nurses,

Paramedics, or EMTs provide Jesse Jacobs any of his prescribed Alprazolam

medication.

61.     On March 06, 2015 at approximately 11:55am, E.M.T. Joe Lloreda completed Jesse C. Jacobs's Mental Health Screening/Referral Form.  He noted the prescription for Alprazolam, and noted that he took two milligrams three times a day, but immediately placed Jesse on a detoxification protocol.

62.     On March 11, 2015, Joe Lloreda, and Doe Williams filled out a medical authorization for the release of Jesse C. Jacobs' medical records and Jacobs signed the release.   The release requested "Diagnosis, Medication and Treatment records, Discharge Summary."   The Release was faxed the next day to "Dr. Tracy Miller, and Dr. Ira Flax. The medical authorization was not faxed to the office of Jacobs's primary mental health care physician for the panic disorder and prescriber of the Alprazolam, Dr. LaGrone, his psychiatrist.

63.     On March 06, 2015, it was well known that abruptly discontinuing any benzodiazepines including Alprazolam could lead to severe, painful and terrifying withdrawal symptoms, including death.

64.     This is not the first instance that the Galveston County Jail has refused to administer the non-narcotic, DEA Schedule IV, Benzodiazepine-Alprazolam, it is the Jail's custom and practice to initiate immediate detoxification, and discontinue an inmate's use of the non-narcotic, DEA Schedule IV, Benzodiazepine, and it continues to be its directed and encouraged policy and custom in Galveston County, as recent as the time of the filing of this complaint.

65.    It was also known that discontinuation of the non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam for long term users cannot be safely, unless the medication was tapered off in a slow and deliberate fashion, and it is best that the patient be closely monitored by a physician, preferably in a hospital setting.

66.    Neither Dr. McNeel, Dr. Faust, Dr. Becker, nor Nurse Practitioner, Josie Irogbu took any further action to verify Jesse's prescription for Alprazolam, nor seek his medical records.  At all times relevant to this action the Defendants possessed the actual Alprazolam pills in Jacobs's prescription bottle, in the jail, but they did not act to provide Jesse any of his duly prescribed medication that his body had become physically dependent upon and need for his severe panic disorder.

67.    As early as Tuesday March 10, 2015, based on medical records,  Dr. Teresa M. Becker reviewed the medical intake records regarding Jesse Jacobs that had been prepared by  Joe Lloreda, E.M.T., and knew or should have been aware of Jesse's long term use of Alprazolam, since there was a letter, and prescriptions, included in the records from Jesse's   psychiatrist, Dr. Don LaGrone explaining that Jesse was a patient of his for over 10 years, and stressing the importance that Jesse take his medication, which went ignored by Dr. Becker. (See Exhibit 5- *Galveston County Jail Medical records*)

68.    From March 11, 2015 until Jesse's death on March 14, 2015, neither. Lloreda, Dr. Becker, Dr. Faust, Dr. McNeel, nor any others diagnosed Jesse as a person at risk of Alprazolam severe withdrawal complications, based on his physical dependence on the medication after being on the prescribed medication for a long term period.

69.    Further, they failed to advise or the officers, deputies, and medical staff interacting with Jacobs to be alert to signs and symptoms of Alprazolam withdrawal and supervise.

70.    Neither Dr. Linea McNeel, and other Galveston County Medical Doctors, Nurse Practitioners, Nurses, Paramedics, nor EMTs documented the medical necessity to discontinue the Alprazolam.

71.    Between March 06, 2014 until Jacobs's death on March 14, 2015, , Dr. Faust, Dr. Becker, NP Josie Irogbu and later Dr. McNeel all failed to take any measures to taper the Alprazolam medication and avoid the foreseeable withdrawal symptoms experienced by Jesse as a result of his physical dependence and his body's need for the medication. After the withdrawal symptoms manifested Dr. Linea McNeel, and other Galveston County Medical Doctors, Nurse Practitioners, Nurses, Paramedics, and EMTs ignored the symptoms, state above and incorporated by reference, that were due to the physical withdrawals, and did nothing to treat him. His symptoms also included sleep-deprivation, exacerbation of his pre-existing medical conditions, including his documented high blood pressure with reading reaching stroke levels of 158 /118.

72.    Soon after Jesse arrived at the Jail, he began to deteriorate physically. The seizures, and sweating profusely and racing heartbeat suffered by Jesse were foreseeable as a known symptoms of Alprazolam withdrawal for medical professionals and the Galveston County Jail.

73.     Jesse was experiencing withdrawal symptoms and asked for his Alprazolam medication, but his request was denied. Dr. Linea McNeel along with Dr. Linea McNeel, and other Galveston County Medical Doctors, Nurse Practitioners, Nurses, Paramedics, EMTs failed to personally check Jacobs' medical record history with his primary care physicians. They ignored Jacobs' excessively concerning vital signs. They failed to perform a mental status exam, or take any other reasonable action to investigate the medical status of Jacobs.

74.     On March 8, at 12:53am, Dr. Harry Faust, one of the psychiatrist, prescribed propranolol (inderal) 20mg 1 tablet daily-x 90 days venlafaxine tablet (effexor) 37.5-take 1 tablet twice daily for 90 days.  The entry for these prescriptions were made by a jail nurse, Sandra Harden, R.N.  (See Exhibit 10- *Faust Prescriptions*) Records that accompany that prescription state his condition to be NKD, and that he had no known allergies. The signature Dr. Faust seems to be signed on March 6, 2015 23:53, but the prescription was entered 3/7/15 12:54 AM, which other entry dates of 3/8/15 12:54am for propranolol (inderal) 20mg 1 tablet daily-x 90 days and entry date 3/8/15 12:53am for the venlafaxine tablet (effexor) 37.5-take 1 tablet twice daily for 90 days, we are left to assume that Dr. Faust was at the jail in person to generate this signature every late in the evening at and after midnight. The videos requested will clarify these confusing facts.

75.     There was no documentation in Jesse's medical records indicating why Dr. Harry Faust, one of the psychiatrist, prescribed propranolol (inderal) 20mg or

venlafaxine tablets (effexor) 37.5 mg., what condition the prescriptions were to treat, or the basis for the need of the new prescriptions.

76.     Jesse continued experiencing complications from the discontinuation of the Alprazolam, severe panic disorder, anxiety, and physical dependence. Two days after starting the new prescriptions issued by Dr. Harry Faust, propranolol (inderal), and venlafaxine (effexor) Jesse experienced his first seizure in his life, a grand mal seizure.

77.     Dr. Faust failed to follow-up with his patient or medically monitor him after prescribing new medications. Further, Dr.  Faust failed to instruct a follow-up from another physician.   Each Benzodiazepine withdrawal scale for corrections form completed by Galveston County medical personnel indicated that Jesse was getting along just fine, indicating an average level. (See Exhibit 5- *Galveston County Jail Medical Records/Benzodiazepine withdrawal scale for corrections form*)

### E. Jesse C. Jacobs's Deadly Medical Crisis

78.     Jesse did not receive his prescription Alprazolam medication, or any substitute benzodiazepine to assist in reducing the possibility of Jesse lapsing into acute Alprazolam withdrawal syndrome, after being on the medication for ten years, and likely to physically dependent upon the medication, even if the prescription was found to be an option call, regarding the need for the treatment of his severe panic disorder.

79.     Jesse suffered documented racing heartbeats, stroke level blood pressure, tremors, vomiting, sweating profusely, diarrhea and seizures (it is likely he also suffered from hallucinations, and delusions as well).

80.     Deborah Wiggins, a Registered Nurse, worked overnight and Officer J.W. Hogan arrived for duty on the morning of March 13, 2015.  Nurse, Deborah Wiggins is also responsible for ensuring that inmates who are newly admitted to the FSP unit are interviewed, and those that are in FSP are monitored.

81.     On March 13, 2015, after Deputy Hogan arrived, Jesse was found unresponsive without a pulse in his solitary confinement cell. Although the medical records state Jesse was drooling, and was observed through glass lying on his left side, face down, experiencing deep respirations, and was not responding to verbal commands.

82.     Before CPR emergency services were performed or a call was made to 911, for emergency services, Deborah Wiggins, left Jesse Jacobs to returned to the clinic, to retrieve ammonia caps, in an effort to confirm Jesse Jacobs was not faking. She summoned another nurse, Monica McCray, L.V.N. that also worked overnight to return with her to Jesse C. Jacobs' cell.

83.     Deborah Wiggins eventually instructed Sheriff Deputy Hogan to call 911 and she finally began compressions. Monica McCray L.V.N. brought a crash cart, an automatic defibrillation and attached it to Jesse C. Jacobs. Rhythm noted to be asystole (no pulse), no shock administered, chest compressions and bagging utilizing chin tilt, rhythm again was analyzed, but no shock.

84.     The emergency medical team arrived, after the 911 call was made by someone in the jail, apparently after the jail medical staff was unable to medically assist Jesse. The emergency medical team performed CPR for an extended period of time, about one hour, and was able to regain a pulse, after Jesse C. Jacobs, was down for possibly as long as an hour according to the University of Texas Medical Branch (UTMB) Hospital medical records. (See Exhibit 6-UTMB Medical Records)

85.     Neither Dr. McNeel, nor any other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, nor Galveston County personnel, properly treated Jesse C. Jacobs's Alprazolam withdrawal crisis, even when his symptoms were beyond apparent, by failing to administer regular mental status exams, while Jacobs was under the detoxification protocol in the FSP unit.

86.     Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel all failed to adequately interview, access, or review Jacobs' medical records. Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel failed to administer proper mental health or physical evaluations.  Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel failed to supervise and regularly check Jacobs's vital signs when he was under the detoxification protocol in the FSP unit. Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic

one medical staff member, and Galveston County personnel failed to adequately review Jacobs's chart or medical history, despite the fact that Jacobs had been under the detoxification protocol in the FSP unit suffering with seizures.

87.   Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel also failed to properly monitor Jesse C. Jacobs.  Despite Jesse C. Jacobs's distress, neither Dr. Linea McNeel, nor any of the Jail medical staff members consulted any of Jesse C. Jacobs's primary treating physicians or sought his medical history, and neither ever conducted a mental health status exam, or send Jesse to the Hospital.

88.   While under the detoxification protocol in the FSP- solitary confinement cell, Jesse was locked in his solitary confinement cell and was away from the other inmates and unable to make phone calls, use the showers, or toilet without a jailer's consent.

89.   Once housed in the solitary confinement cell Jesse continued to suffer from severe, classic, and terrifying withdrawal symptoms for the next three days of his life. He was never seen by a psychiatrist during this time, while he was in the FSP solitary confinement cell. Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel withheld the Alprazolam prescription pills from Jesse and failed to ever contact Dr. LaGrone and failed to timely contact Jesse other primary physicians, before commencing the cessation of the lawfully prescribed Alprazolam.

90.    Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel were responsible for providing assessment and diagnosis of psychiatric disorders at the Jail, and was responsible for the mental health care of Jesse C. Jacobs.  Galveston County, Dr. McNeel, other jail physician, nurse practitioner, nurse, EMT, paramedic one medical staff member, and Galveston County personnel failed to properly diagnose or treat Jesse C. Jacobs's Alprazolam withdrawal syndrome.

91.    On March 10, 2015, Jesse was housed in the general population B-3 unit, Jesse advised the medical staff that he was feeling bad again, stated his heart was pounding, his blood pressure reading was 180/120, a normal blood pressure reading is 120/80, and his was Diaphoretic, he was anxious, confused from the detoxing from Alprazolam and his blood pressure continued to rise as high as 195/119.

92.    At approximately 2:00 pm, on March 10, 2015, Jesse was housed in the General Population, B-3 unit, Jesse suffered his first known seizure. Jesse was found with a bloody face, on the floor, and was first assaulted with ammonia smelling salts to determine if he was faking his seizure, after his seizure was confirmed he was given Gatorade, and water, then was left on the floor.

93.    At approximately 10:00am, on March 11, 2015, Jesse while housed in the B-3 general population unit, Jesse suffered his second documented seizure. Jesse was found lying on the floor on his side with so much blood covering his face that initially the origination point was unclear, it was determined he had bit his tongue during a seizure. He advised the jail and medical staff at that time he did not have a history of

seizures before incarceration, in the "free world." Jesse only knew who he was, but was not oriented to where he was or the date, according to the Jesse C. Jacobs' jail inmate records.

94.     At approximately 4:00 pm, on March 11, 2015, Jesse was re-housed in FSP-solitary confinement cell unit, where Jesse suffered his third documented seizure. Jesse was found lying on his side and observed with rapid, snoring respirations. He again was assaulted with ammonia caps, and a firm sternal rub was performed, to be certain that he was not faking a seizure.  Since Jesse did not respond to the ammonia cap assault, or sternal rub, the physician was notified.

95.     Jesse was finally seen by a physician, Dr. Becker, and at that time she reviewed his records, which included copies of his prescriptions and a letter from his psychiatrist, but Dr. Becker encouraged the discontinuation of his Alprazolam medication. She did not contact his long time treating physician. She contacted another psychiatrist, Dr. Linea McNeel, who recommended Jesse start Librium protocol for seizures due to Alprazolam withdrawals. There are no indications that Dr. Linea McNeel examined Jesse Jacobs personally, or that any follow-up care was provided.

96.     After receiving the Librium prescriptions, Jesse's seizures continued, and at approximately 11:25 pm, on March 12, 2015, Jesse suffered his fourth and last documented seizure.

97.     At approximately 6:10 am, on March 13, 2015, while Jesse remained housed in the FSP solitary confinement cell unit, Jesse was found unresponsive in his cell,

without a pulse, when it is believed he suffered his final seizure, although undocumented, and he went into cardiac arrest. As a direct and proximate result of the acts and omissions set forth herein, Jesse died.

98.     Prior to death, Jesse endured extended pre-death agony, seizures, pain within his body and horrifying mental anguish.   The Galveston Coroner's Report was amended from natural causes "seizure disorder" as the cause of death, to include Abrupt discontinuation of long term Alprazolam medication, on September 8, 2015 (see Exhibit 7-*Death Certificate/ Autopsy/Toxicology Report)*


## F. Policies, Practices and Culpable Conduct


99.     The risk of withdrawal syndrome in Alprazolam users was well known in jails on March 06, 2015.  Sheriff Trochesset, and Galveston County, directed the Jail staff, and its medical staff members to follow policies, practices, customs and usages which caused prisoners to suffer, untreated, serious symptoms as a result of the termination of their benzodiazepine medications. Such policies are the moving force behind and caused the injuries suffered by Jesse Jacobs in this case.   By following such policies Defendants were deliberately indifferent to the serious medical need of Jesse C. Jacobs.

100.   Henry  Trochesset, Galveston County Sheriff, Galveston County Sheriff's office, Galveston County Jail, and any John Doe policy makers were also deliberately

indifferent to the serious medical needs of Jesse C. Jacobs by failing to train staff and implement jail policies, practices, customs and usages that adequately addressed the obvious and known health and safety risks to inmates entering the Jail while taking prescribed medications in the class of benzodiazepines; and the likelihood that a person would go into withdrawal, after a physical dependence to the medication occurs, and without proper medical treatment being available.

101.  Henry  Trochesset, Galveston County Sheriff, Galveston County Sheriff's office, Galveston County Jail, and any John Doe policy makers acted negligently, recklessly, wantonly, willfully, knowingly, intentionally and with deliberate indifference to the serious medical need of Jesse C. Jacobs, when Jesse began demonstrating severe withdrawal symptoms as a result of the abrupt cessation of the long term Benzodiazepine, Alprazolam, to which Jesse had developed a physical dependence, and needed for his severe panic disorder and

anxiety.

102.  As a direct and proximate result of the defendant's actions, before his death Jesse suffered severe emotional distress, pain, suffering, and extreme and horrifying mental distress.

103.  As a further direct and proximate result of Jesse C. Jacobs's wrongful death Jesse C. Jacobs, his survivors and/or heirs have suffered permanent damages, including but not limited to, the loss of his support, services, and society, including loss of companionship, care, assistance, attention, protection, advice, guidance,

counsel, instruction, training, and education, as well as the loss of prospective inheritance.

104.   As a further direct and proximate result of Jesse C. Jacobs's wrongful death Jesse C. Jacobs's survivors, next of kin and/or heirs have suffered permanent damages, including, but not limited to, grief, depression, and severe emotional distress. They have incurred funeral bills, and medical bills and treatment.

105.   Defendant's violations of Jesse C. Jacob's constitutional rights resulted from a policy, pattern, custom and/or practice of deliberate indifference to the serious medical needs of inmates at the direction and encouragement of the policymakers.

106.   Plaintiffs assert that the death of Jesse C. Jacobs was the result of Defendants Henry  Trochesset, Galveston County Sheriff, Galveston County Sheriff's office, and Galveston County Jail, Doe actors, and Doe Policy makers, jointly and severally, that the death and harm suffered was the result of Defendants' conduct motivated by evil intent, or done recklessly or with callous indifference to the federally protected rights of Jesse C. Jacobs, and further attempted to impede discovery of the constitutional violations by Withholding of Records.

## G.   <u>Withholding of Records</u>

107. In addition to the civil rights violations, Defendant Galveston County has blocked and refused the release of Jesse Jacob's video of his entire period of incarceration in the Galveston County Jail, the full and complete set of medical records of Jesse Jacobs in the Galveston County Jail, the audio and video recordings

of his parents visits. The requests were made properly, a Public Information Act request (formally open records request), pursuant to Public Information Act – Texas Government Code, Chapter 552, and with the required Health Insurance Portability and Accountability Act (HIPPA) release authorizations were provided; however, it is clear that the medical records are not complete, or portions of the records are missing. All other requests are being denied.

## VII. CLAIMS FOR RELIEF

## FIRST CLAIM – 42 U.S.C. §1983  SHERIFF HENRY  TROCHESSET, GALVESTON COUNTY,GALVESTON COUNTY JAILERS JOHN DOE 1-20, AND DR. LINEA MCNEEL, DEPRIVED JESSE C. JACOBS OF RIGHTS, PRIVILEGES AND IMMUNITIES SECURED BY THE FOURTEENTH AND EIGHTH AMENDMENTS

### *DENIAL OF ESSENTIAL MEDICAL CARE*

108. Plaintiffs incorporate by reference all of the preceding paragraphs. Henry Trochesset, Galveston County Sheriff, Galveston County Sheriff's office, Galveston County and any John Doe jailers and policy makers have, acted under color of state law.

a.      **Defendant,  Galveston County Sherriff  Trochesset**

109.   Acting in his individual capacity, Sheriff Trochesset personally directed and encouraged the "detoxing of inmates" on any Alprazolam regimen, including Jesse Jacobs.  Sherriff Trochesset was personally involved in or had direct responsibility for actions of Jailers and medical personnel including physicians, nurses, EMT who knew of Jesse Jacob's injuries and refused to help him.  Sheriff Trochesset denied necessary medical treatment requested by Jesse Jacobs and ignored medical treatment ordered by Dr. Lagrone.  Such denial amounts to a violation of  Jesse Jacobs constitutional rights including Eighth Amendment rights prohibiting cruel and unusual punishment.

110.   He discouraged jail and Galveston County medical staff including nurses and doctors, from initiating emergency calls to 911 for inmates with serious medical needs to be transported to the hospital including Jesse Jacobs, despite the jail facility not having an infirmary.

111.   Sheriff Trochesset sanctioned, approved, directed, encouraged, and knowingly consented to the unconstitutional conduct including the deprivation of Jesse Jacobs' non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam regimen by the lower level employees, and contractors specifically stated in Paragraph II and IV above.

112.    Sheriff Trochesset had direct involvement in the decisions regarding inmate housing, medical care, and policies. He made no provisions for inmates that he

required to be placed on detoxification protocol, although Sheriff Trochesset knew and it was reasonably foreseeable that these inmates including Jesse Jacobs would likely suffer from severe withdrawal symptoms, requiring medical attention, would be a foreseeable result, for inmates that had developed a physical dependence on the medication or other substances that the sheriff deemed detoxification was necessary.    The acts of Sherriff Trochessett complained of amounted to an aggravated tort in that the conduct was intentionally injurious, grossly negligent, reckless, callous, and shocking because Jesse Jacob suffered a severe and obvious injury, four seizures. Proper medical attention was essential for the preservation of Jesse Jacob's life. Alprazolam was a medical treatment which Jesse Jacobs "needed" rather than merely desired and Dr. McNeel continued to deny Jacobs medical treatment.  Sherriff Trochesset's deliberate indifference was demonstrated when he denied Jesse Jacobs necessary medical treatment requested by Jesse and ignored medical treatment ordered by Dr. Lagrone. He knew of Jesse Jacobs need for treatment but intentionally refused to provide him his Alprazolam, delayed Jesse' necessary medical treatment for non-medical reasons (lack of staff and the need to control budget expenditures) and prevented Jesse from receiving needed treatment.

**b.     Defendant, Galveston County**

*DENIAL OF ESSENTIAL MEDICAL CARE*

113.   Galveston County is a unit of local government organized under the laws of the State of Texas.  Defendant is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

114.   Galveston County as a unit of local government directed and encouraged the "detoxing of inmates" on any Alprazolam regimen.

115.   It discouraged jail and medical staff from initiating emergency calls to 911 for inmates with serious medical needs to be transported to the hospital, despite the jail facility not having an infirmary.

116.   It sanctioned, approved, directed, encouraged, and knowingly consented to the unconstitutional conduct including the deprivation of non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam regimen by the lower level employees, and contractors specifically stated in Paragraph II and IV above.

117.   It had direct involvement in the decisions regarding inmate housing, medical care, and policies. It made no provisions for inmates that he required to be placed on detoxification protocol, although it's administrators, and policy makers directing and encouraging benzodiazepine detoxification protocol knew and it was reasonably foreseeable that these inmates would likely suffer from severe withdrawal symptoms, requiring medical attention, and it would be a foreseeable result, for inmates that had developed a physical dependence on the a benzodiazepine medication or any other substances that the sheriff deemed detoxification was necessary.

*DENIAL OF ESSENTIAL MEDICAL CARE*

**c.      Defendant, Galveston County Jailers John Doe # 1-20**

118.   Defendant, Galveston County Jailers John Doe # 1-20 are employed by
Galveston County as Jailers of the Galveston County. John Doe Jailers # 1-20 are sued
in their "personal or individual capacity, acting under color of law."   Each jailer
individually, in combination, and collectively demonstrated deliberate indifference
to the serious medical needs of Jesse Jacobs.1983 and at all times relevant to this
case acted under color of law.


119.   Each jailer individually, in combination, and collectively directed and
encouraged the "detoxing of inmates" on any Alprazolam regimen.

120.    Each jailer individually, in combination, and collectively discouraged other jail
and medical staff from initiating emergency calls to 911 for inmates with serious
medical needs to be transported to the hospital, despite the jail facility not having an
infirmary.

121.    Each jailer individually, in combination, and collectively sanctioned, approved,
directed, encouraged, and knowingly consented to the unconstitutional conduct
including the deprivation of non-narcotic, DEA Schedule IV, Benzodiazepine,
Alprazolam regimen by the lower level employees, and contractors specifically
stated in Paragraph II and IV above.

122.   Each jailer individually, in combination, and collectively had direct
involvement in the decisions regarding inmate housing, medical care, and policies. It
made no provisions for inmates that he required to be placed on detoxification

protocol, although it's administrators, and policy makers directing and encouraging benzodiazepine detoxification protocol knew and it was reasonably foreseeable that these inmates would likely suffer from severe withdrawal symptoms, requiring medical attention, and it would be a foreseeable result, for inmates that had developed a physical dependence on the a benzodiazepine medication or any other substances that the sheriff deemed detoxification was necessary.

123.   As specifically stated in paragraph II and V above Galveston County Sheriff Trochesset and Galveston County and Galveston County Jailers John Doe 1-20, individually, and collectively deprived Jesse C. Jacobs of rights, privileges and immunities secured by the Fourteenth and Eighth Amendments to the U.S. Constitution including, but not limited to the right to be free from cruel and unusual punishment, the right to be protected, and the right to adequate medical care when incarcerated.

124.   Sheriff Henry Trochesset, Galveston County, Galveston County Jail, and any John Doe policy makers failed to adequately train and supervise the Jail corrections officers, medical personnel, and staff at the intake, assessment and correctional and medical care of inmates who arrive at the jail while taking prescription drugs in the non-narcotic, DEA Schedule IV, benzodiazepine class, including Jesse C. Jacobs' Alprazolam prescription.

125.   The rules, regulations, customs, policies and procedures of Galveston County Jail and Sheriff Henry Trochesset were inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Jesse C. Jacobs.

126.   Although the policymakers were on notice of the obvious need to train and supervise Jail staff in the area of day to day Jail operations, policies and procedures relating to medical and mental health assessment and follow up care of inmates, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, and any John Doe policy makers failed to adequately train and supervise the individual Jail staff in that regard.

127.   The policy makers failed to develop and institute adequate reality based training programs relating to the incarceration, care and treatment of individuals such as Jesse who had pre-existing medical conditions. As such, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, and any John Doe policy makers were deliberately indifferent to the serious medical needs of Jesse C. Jacobs.

128.   The policy makers developed and instituted a policy against proper care and treatment of individuals with Alprazolam dependency, not addiction, such as Jesse C. Jacobs, who had pre-existing medical need and condition. As such, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, John Doe jailers and any John Doe policy makers were deliberately indifferent to the serious medical needs of Jesse C. Jacobs.

**Defendant, Dr. Linea McNeel**

*DENIAL OF ESSENTIAL MEDICAL CARE AND INADEQUATE CARE*

129.   Defendant, Dr. Linea McNeel, a psychiatrist is employed by Galveston County through contract. Dr. McNeel is sued in her "personal or individual capacity, acting under color of law."   Dr. McNeel individually, in combination, and collectively demonstrated deliberate indifference to the serious medical needs of Jesse Jacobs in violation of 42 USC sec. 1983 and at all times relevant to this case acted under color of law.

130.   Dr. McNeel deliberate indifference was demonstrated when  she denied Jesse Jacobs necessary medical treatment requested by Jesse and ignored medical treatment ordered by Dr. Lagrone. She knew of  Jesse Jacobs need for treatment but intentionally refused to provide him his Aprazolam, delayed Jesse' necessary medical treatment for non-medical reasons and prevented Jesse from receiving needed treatment.

131. Dr. McNeel individually, in combination, and collectively directed and encouraged the "detoxing of inmates" including Jesse Jacobs on any Alprazolam regimen.

132.   Dr. McNeel individually, in combination, and collectively discouraged other jail and medical staff from initiating emergency calls to 911 for inmates including Jesse Jacobs with serious medical needs to be transported to the hospital, despite the jail facility not having an infirmary.

133.   Dr. McNeel individually, in combination, and collectively approved, directed, encouraged, and knowingly consented to the unconstitutional conduct including the deprivation of non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam regiment to Jesse Jacobs by the lower level employees, and contractors specifically stated in Paragraph II and IV above.

134.   Dr. McNeel individually, in combination, and collectively had direct involvement in the decisions regarding inmate housing, medical care, and policies. It made no provisions for inmates that he required to be placed on detoxification protocol, although it's administrators, and policy makers directing and encouraging benzodiazepine detoxification protocol knew and it was reasonably foreseeable that these inmates including Jesse Jacobs would likely suffer from severe withdrawal symptoms, requiring medical attention, and it would be a foreseeable result, for inmates that had developed a physical dependence on the a benzodiazepine medication or any other substances that the sheriff deemed detoxification was necessary.

135.   As specifically stated in paragraph II and V above Galveston County Sheriff Trochesset and Galveston County, Galveston County Jailers John Doe 1-20, Dr. McNeel individually, and collectively deprived Jesse C. Jacobs of rights, privileges and immunities secured by the Fourteenth, Eighth, and Fifth Amendments to the U.S. Constitution including, but not limited to the right to be free from cruel and unusual punishment, the right to be protected, due process, and the right to adequate medical care when incarcerated.

136.   Sheriff Henry Trochesset, Galveston County, Galveston County Jail, Dr. McNeel, and any John Doe policy makers failed to adequately train and supervise the Jail corrections officers, medical personnel, and staff at the intake, assessment and correctional and medical care of inmates who arrive at the jail while taking prescription drugs in the non-narcotic, DEA Schedule IV, benzodiazepine class, including Jesse C. Jacobs' Alprazolam prescription.

137.   The rules, regulations, customs, policies and procedures of Galveston County Jail and Sheriff Henry Trochesset were inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Jesse C. Jacobs.

138.   Although the policymakers were on notice of the obvious need to train and supervise Jail staff in the area of day to day Jail operations, policies and procedures relating to medical and mental health assessment and follow up care of inmates, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, Dr. McNeel, and any John Doe policy makers failed to adequately train and supervise the individual Jail staff in that regard.

139.   The policy makers failed to develop and institute adequate reality based training programs relating to the incarceration, care and treatment of individuals such as Jesse who had pre-existing medical conditions. As such, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, Dr. McNeel, and any John Doe policy makers were deliberately indifferent to the serious medical needs of Jesse C. Jacobs.

140.   The policy makers developed and instituted a policy against proper care and treatment of individuals with Alprazolam dependency, not addiction, such as Jesse C. Jacobs, who had pre-existing medical need and condition. As such, Sheriff Henry Trochesset, Galveston County, Galveston County Jail, John Doe jailers, Dr. McNeel, and any John Doe policy makers were deliberately indifferent to the serious medical needs of Jesse C. Jacobs. The acts of Dr. McNeel complained of amounted to an aggravated tort in that the conduct was intentionally injurious, grossly negligent, reckless, callous, shocking, and deliberately indifferent because Jesse Jacob suffered a severe and obvious injury, four seizures. Proper medical attention was essential for the preservation of Jesse Jacob's life. Alprazolam was a medical treatment which Jesse Jacobs "needed" rather than merely desired and Dr. McNeel continued to deny Jacobs medical treatment.

141.   Such denial amounts to a violation of Jesse Jacobs constitutional rights including Eighth Amendment rights prohibiting cruel and unusual punishment.


## SECOND CLAIM-VIOLATION OF ARTICLE ONE SECTION THIRTEEN OF THE TEXAS CONSTITUTION.

142.    Plaintiffs incorporates by reference all of the preceding paragraphs. Defendants were acting under color of state law; the defendants are liable under as well as, violation of Article One Section Thirteen of the Texas Constitution that cruel or unusual punishment shall not be inflicted.

143.   The Defendants are liable under Article One Section Thirteen of the Texas Constitution that cruel or unusual punishment shall not be inflicted, because they deprived Jesse Jacobs of constitutional rights provided by federal and state law that occurred under color of state law, and were caused by state actors.

144.   Jesse C. Jacobs' had a right under the Eighth Amendment and the Due Process Clause, and as well as, Article One Section Thirteen of The Texas Constitution while incarcerated to adequate medical care, and be free from deliberate indifference to his serious medical needs.

145.   The Defendants treated Jesse with deliberate indifference to his serious medical need especially for treatment of Severe Panic Disorder, and anxiety, when the defendants recklessly disregarded the substantial risk of harm of abruptly discontinuing Jesse's long-term benzodiazepine-alprazolam prescription that he needed to treat his mental health, and that his body developed a physical dependence.

146.   Jesse C. Jacobs had a right to be free of cruel and unusual punishment.

Defendants violated when Sheriff Henry Trochesset, Galveston County, Galveston County Jail, Dr. Linea McNeel, and any John Doe policy makers acted with deliberate indifference to his serious medical need, after he began having seizures and their medical staff and Librium treatment were unable to control his seizures, in failing to verify his treatment with his physician and resume his medication, in failing to transport him to the hospital, or release him from custody. Galveston's post-

deprivation procedures are inadequate to remedy the deprivation, since Jesse died as a result of the deprivation.

147.   The policy, practice, and custom was to conduct an intake interview and determine whether an inmate has health concerns, or has been taking any controlled substances. If it is revealed that an inmate has been taking certain controlled substances, illegally or under prescription, then they are to be immediately detoxed, without the requirement of consulting with a physician. But rather, medical care decisions were based on the inmate's admission of use by inmates, inmate stumbling, or "when you see it you know it." (See 4-, *Jail Intake forms*)

## **THIRD CLAIM – WRONGFUL DEATH**

148.   Sheriff Henry Trochesset, Galveston County, Galveston County Jail, Dr. Linea McNeal, and any John Doe policy makers, or its agent's or servants, wrongful actions, neglect, carelessness, unskillfulness or default and omissions in placing Jesse Jacobs on a detox protocol, failing to give Jesse Jacobs his prescribed medicine, failing to contact his physicians, Dr. LaGrone and failing to transport him to a hospital with a physician after he had each of his four known seizures.

149.   Defendant's acts caused the wrongful death of Jesse resulting in damages recoverable under Tex. Civil Practice and Remedies Code Sec. 71.002.

150.   Defendant owed the decedent, Jesse Jacobs, a duty of care to provide him medical care and treatment in the Galveston Jail. The defendant breached that duty by placing Jesse Jacobs on a detoxification protocol, depriving him of his medication, failing to transport him to a hospital after suffering seizures and not medically monitoring his known condition.

## FOURTH CLAIM-VIOLATION OF AMERICAN WITH DISABILITIES ACT AND REHABILITATION ACT OF 1973

151.   Thirty-two (32) year old, Jesse has suffered with, a well diagnosed, severe panic disorder for over a decade, as a result he has had an active prescription for Alprazolam to help alleviate his symptoms and treat his condition.  Galveston County knew of Jacobs' medical condition.

152.   Upon entering into custody Jesse made the Sheriff's Dept., and medical staff aware that he was under outside psychiatric care, and diagnosed with Severe Panic Disorder, among other medical issues, and had been prescribed Alprazolam for his severe panic disorder, and anxiety. Jesse requested his medication from the jail staff and medical providers, but was denied his medication and adequate medical services, while an inmate in the Galveston County Jail.

153.   Jesse complained to his mother by phone from the jail, that he was not receiving his medications, he was suffering, he was having a "hard time," and needed his attorney's number in an attempt to get help in getting his medication.

154.   The Galveston County jail refused to release these telephone call recordings, or close circuit video visits.  According to public records, Galveston County Jail has failed to meet jail requirement as it relates to health services, in the past. Each facility shall have and implement a written plan, approved by the Commission, for inmate medical, mental, and dental services. The plan shall provide procedures for the distribution of prescriptions in accordance with written instructions from a physician by an appropriate person designated by the sheriff/operator.

155.   Although the Texas Commission on Jail Standards indicates that Galveston County Jail was compliant, for the years of 2010 through 2015, including the period that Jesse was an inmate, many of the Jail standard requirements were not met for the same or similar reason in multiple years, specifically regarding health services, mental health documentation, and not providing proper supervision to the inmates by checking on the inmates every 30 minutes as prescribed by the jail standards requirements. The latest failure to meet all the Texas Jail Standard Requirements came in April 2015 of last year, less than 45 days after Jesse C. Jacobs' death.

156.   Despite the failure to accommodate Jesse mental illness, severe panic disorder, and anxiety with his prescribed Alprazolam, compliant supervision could have likely assisted in getting medical attention to Jesse sooner, not only did he go without face to face supervision every hour as all inmates should, he should have been supervised every thirty (30) minutes as an inmate with a medical condition. Jesse went unmonitored for as long as six hours, according to medical records (Exhibit 5-*Jail Medical Records*)

157.   Jesse C. Jacobs is a qualified person with a disability, as defined under the ADAA and Rehabilitation Act of 1973 as Amended, since he has suffered from Severe Panic Disorder, Anxiety, Depression, all mental illnesses. As a qualified person with a disability under the ADAA, who requested a reasonable accommodation. Jesse was discriminatorily denied and deprived of the reasonable accommodations, specifically, he was discriminatory deprived of his medication, Alprazolam and was not transported to a hospital after suffering his first three seizures in the Galveston county Jail. (Exhibit 3- *Intake medication receipt, Alprazolam*), by Henry  Trochesset-the Galveston County Sheriff, Galveston County Sheriff's office, Galveston County Jail, any Doe actors, Dr. Linea McNeel, and any Doe Policy makers, by depriving Jesse reasonable accommodations his medication, Alprazolam and not transported to a hospital after suffering his first three seizures in the Galveston county Jail.  the above named actors violated the Americans with Disabilities Act as Amended and the Rehabilitation Act of 1973, as amended.

157.    Due to his severe panic disorder and ADD Jesse Jacobs suffered from problems and had frequent problems with concentration as well as had problems with his interactions with others.   Jacobs was impaired due to the severe panic disorder.

158.    Galveston County could reasonably accommodate Jesse Jacob's disability with, for instance, simply providing him his prescribed Alprazolam as recommended by his treating psychiatrist, Dr. LaGrone.

<u>SECTION 504 OF THE REHABILITATION ACT</u>

159.     Section 504 of the Rehabilitation Act states that "no qualified individual with a disability in the United States shall be excluded from, denied the benefits of, or be subjected to discrimination under" any program or activity that either receives Federal financial assistance. The Galveston County Jail receives federal financial assistance and, as set forth above, Jesse Jacobs is a qualified individual with a disability who was discriminatory denied the benefits of medical care while in the Galveston County Jail due to his disability. Incorporates herein the paragraph above on Americans with Disabilities Act, as Amended section.

## VIII. DAMAGES

Plaintiffs request the following relief:

## A.     Punitive Damages

158.  Plaintiffs request punitive damages against each individually-named defendant. Exemplary damages based on conduct of placing Jesse C. Jacobs on a detox protocol without consulting his medical records or treating physician, and allowing Jesse C. Jacobs to continue to suffer daily experiencing seizures, racing pulse rates, stroke level blood pressure, restlessness, anxiousness, irritability, jittery, agitation, unrestful sleep, confusion, nightmares, tremors, fatigue, muscle aches, biting through his tongue drawing extreme amounts of blood across his face, profuse sweating, urination and diarrhea without access to a toilet and a ultimately a humiliating death without regard to his serious medical needs, while in the custody of the Galveston County Jail and care of Boone Chapman, Soulta Health's medical

personnel, Physicians, Nurse Practitioner, Registered Nurses, Licensed vocational nurses, emergency medical technicians, that was outrageous, malicious, and morally culpable.

159.   Jesse C. Jacobs Jacob's death resulted from the joint and several acts of Defendants for which Plaintiffs seek punitive and exemplary damages against each individual Defendant (as allowed by law) in an amount appropriate to punish each individual Defendant, and deter others from engaging in similar conduct;

160.   Award punitive damages against Henry Trochesset, Galveston County Sheriff, Galveston County Sheriff's office, Dr. Linea McNeel, and Galveston County Jail, Doe actors, and Doe Policy makers in an amount to be shown at trial;

161.   These actions hereby entitle Plaintiffs to punitive/exemplary damages;

**B.   Actual Damages**

162.   Compensatory general damages against each Defendant, jointly and severally, in the amount proven at trial.

163.   As wrongful death beneficiaries, Plaintiffs seeks actual damages, both general and special, for the loss of their child, Jesse C. Jacobs, for the following specific elements of damages:

164.   Pecuniary Loss resulting from the death of Jesse including, but not limited to, the care, maintenance, support, services, education, advice, counsel, and reasonable contributions of a pecuniary value, loss of inheritance that the surviving family would have received from Jesse C. Jacobs, had he lived.

165.   Termination of the Family Relationship: The positive benefits flowing from the love, support, companionship, and society that Diane Jacobs and Jesse R. Jacobs, would in reasonable probability, have received from Jesse C. Jacobs, had he lived. death.

## C.   Mental Anguish

166.   Mental Anguish suffered by Jesse C. Jacobs during the seven days in jail prior to his death. Mental anguish sustained by Jesse C. Jacobs from the time of the incident until his death;

167.   Mental Anguish suffered by Diane Jacobs and Jesse R. Jacobs**:** the surviving family as a result of the death of Jesse C. Jacobs including, but not limited to, the emotional pain, torment, and suffering that Plaintiff, would, in reasonable probability, experience from the death of Jesse C. Jacobs.

## D.   Loss of Inheritance

168.   The earnings, if any, of the decedent in excess of the amount they would have used for the support of themselves and their families, and which in reasonable probability would have been added to their estates and left to Plaintiffs at their natural death had he lived.

## E.   Compensatory special damages

169.   Including, but not limited to funeral expenses; Compensatory general damages against each Defendant, jointly and severally, in the amount proven at trial.

## F.   Pain and Suffering

170.   Physical pain and suffering sustained by Jesse C. Jacobs from the time of the incident until his death;

**G. Reasonable and necessary medical expenses, Reasonable and necessary funeral and burial expenses.**

171.   Reasonable and necessary medical expenses Jesse C. Jacobs from the time of the incident until the time of his death; and Reasonable and necessary funeral and burial expenses.

**H.     Attorney's Fees**

172.   Plaintiffs are entitled to recover attorney's fees and costs under 42 U.S. C. 1983 and 42 U.S.C §1988 including reasonable and necessary attorney's fees incurred by or on behalf of Plaintiffs

**I.     Equitable Relief**

173.   Equitable relief, including, without limitation, that Galveston County and Sheriff Trochesset be made to apologize and to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein; Such other relief, including injunctive and/or declaratory relief, as the court may deem proper.

**J**.     **Additional Damages**

174.   Plaintiffs seek to recover all court costs, fees, expenses and expert fees. Pre and post judgment interest as permitted by law; and,

Such other relief, including injunctive and/or declaratory relief, as the court may deem proper.

## X. JURY REQUEST

175.    Plaintiffs respectfully demand a trial by jury.

## XI. PRAYER

176.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Estate of Jesse C. Jacobs, Diane Jacobs, Jesse R. Jacobs, and Heirs of Jesse C. Jacobs and respectfully pray that Defendants Galveston County Sheriff Trochesset, Galveston County, Galveston County Jailers John Doe 1-20, and Dr. Linea McNeel be summoned to appear and answer herein, and that upon a final hearing of this cause, that judgment be entered for the Plaintiffs and against Defendants, both jointly and severally, for all damages requested herein, together with pre-judgment and post-judgment interest at the maximum rate allowed by law, attorney's fees, costs of court, and such other and further relief to which Plaintiffs may be entitled at law or in equity. Punish each individual Defendant, and deter others from engaging in similar conduct;

177.    Plaintiffs assert that the death of Jesse C. Jacobs was the result of government actors, Galveston County Sheriff Trochesset, Galveston County, Galveston County Jailers John Doe 1-20, individually, and Dr. Linea McNeel collectively caused the death and harm suffered was the result of Defendants' conduct motivated by evil motive or intent, or done recklessly or with callous indifference to the federally

protected rights of Jesse C. Jacobs, and hereby entitle Plaintiffs to punitive/exemplary damages.

178. Equitable relief, including, without limitation, that Galveston County and Sheriff Trochesset be made to apologize and to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein; Such other relief, including injunctive and/or declaratory relief, as the court may deem proper.

Respectfully submitted,

**THE LEWIS LAW GROUP, PLLC.**

By: _U. A. Lewis_

**U. A. Lewis**
*State Bar No. 24076511*
*Federal Bar No. 1645666*
*P. O. Box 27353*
*Houston, TX 77227*


*Telephone: (713)570-6555*
*Facsimile: (713) 581-1017*
LEAD ATTORNEY FOR THE PLAINTIFFS


By: /s/ Debra V. Jennings
Debra V. Jennings
*State Bar No. 10631850*
*Federal Bar ID: 14373*
*Law Office of Debra V. Jennings*
*Debra V. Jennings*
*6140 HWY 6, # 269*
*Missouri City, Texas 77459  Telephone*
*(832) 230-4455*
*Facsimile: (832) 230-4452*
*Email: lawyerdvj@yahoo.com*
ATTORNEYS FOR THE PLAINTIFFS

*/S/ Randall L. Kallinen*

*Randall L. Kallinen*
*State Bar No. 00790995*
*Federal Bar No.: 19417*
*511 Broadway Street*
*Houston, Texas 77012*
*Telephone: 713.320.3785*
*FAX: 713.893.6737*
*Email: AttorneyKallinen@aol.com*
ATTORNEYS FOR THE PLAINTIFFS