United States District Court
Southern District of Texas
**ENTERED**
November 02, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DIANE JACOBS, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:16-CV-65 |
| VS. | § | |
| | § | |
| HENRY ANDREW TROCHESSET, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER ON
## DEFENDANT SHERIFF TROCHESSET'S MOTION TO DISMISS ON
## GROUNDS OF QUALIFIED IMMUNITY

Plaintiffs, the Estate of Jesse C. Jacobs, Diane Jacobs, and Jesse R. Jacobs, have

filed suit against Galveston County, Galveston County Sheriff Henry Andrew Trochesset,

and several Galveston County jail employees who have yet to be identified.

Jesse C. Jacobs died while he was incarcerated in the Galveston County Jail, and

his parents are suing on his behalf as well as their own. Plaintiffs' Third Amended

Complaint is their current live pleading. (Dkt. 40). At this time, only two defendants have

appeared—Galveston County and the Sheriff. Both the County and Sheriff Trochesset

have moved to dismiss Plaintiffs' Third Amended Complaint. (Dkt. 45, 46). Also pending

is Plaintiffs' motion to compel, asking this Court to require the County and the Sheriff to

answer Plaintiffs' discovery requests. (Dkt. 41).[1] All of these motions have been

extensively briefed.

---

[1]     Both the County and Sheriff Trochesset contend that the Sheriff's assertion of qualified
immunity means that no discovery whatsoever may be conducted, even if such discovery is

In light of the procedural posture of this case, this Memorandum Opinion and Order only reflects the Court's ruling on the Sheriff's motion to dismiss under Rule 12(b)(6) on grounds of qualified immunity. The Court will address the remaining points presented in the Sheriff's motion, and those in the County's motion to dismiss, in a subsequent order.

## BACKGROUND

### A. Factual Allegations[2]

In February 2015, Jacobs pled guilty to his second DWI. On March 6, 2015, Jacobs was sentenced to 30 days in the Galveston County Jail. When Jacobs reported to the Galveston County Jail on March 6, 2015, Plaintiffs allege that he "promptly informed intake of his diagnosed health conditions, including severe panic disorder, and that he

---

directed solely at the County instead of the Sheriff, and even if the Plaintiffs merely seek basic information such as the names of fact witnesses or potential defendants. The County flatly "objects to responding" to any of Plaintiffs' discovery requests, or complying with Rule 26's initial disclosure requirements, because the Sheriff, individually, "has asserted his Qualified Immunity in this matter (Doc. 22), and to respond to such extensive discovery would in effect waive any rights Sheriff Henry Andrew Trochesset may have for protection from litigation under the doctrine of qualified immunity." Further, both Defendants contend that they should not be required to complete any discovery or even exchange initial disclosures until their pending motions to dismiss have been ruled upon, in their entirety. The County has repeatedly reiterated its unwillingness to provide the names of the jailers or employees who interacted with Jacobs, even though they are potential defendants and fact witnesses. Thus, the Court proceeds piecemeal. Presumably, after the jailers are identified and added to the list of Defendants, the parties will address whether qualified immunity applies to yet-unnamed individual jailers or jail employees.

[2]    Plaintiffs' Third Amended Complaint was accompanied by the separate filing of 110 pages of "Supplemental Exhibits." Plaintiffs have yet to be provided basic information in this case, such as a videotape of Jacobs' time in the Galveston County Jail, a complete set of Jacobs' medical records from the Jail, and the names of jail employees on duty while Jacobs was incarcerated. The documents that Plaintiffs have filed are fragmentary, difficult to read, and unauthenticated. Accordingly, the Court focuses upon the factual allegations made in the Third Amended Complaint.

was prescribed and had been taking the non-narcotic, DEA Schedule IV, Benzodiazepine, Alprazolam [Xanax] for over ten years for his severe panic disorder and anxiety." Jacobs had his prescription medication with him, as well as a letter from his treating physician stating it was "imperative" that Jacobs take his medication. Plaintiffs allege that the medical technician present at intake accepted and inventoried the medication and the letter, but then gave contradictory information to Jacobs' mother—first stating that Jacobs would not receive the medication while incarcerated, but then stating that "he would check on it, and if [Jacobs] were allowed to receive his medication, he would receive it." That technician later recorded that he was "unable to verify" Jacobs' prescription.

The truth, according to Plaintiffs, is that the Galveston County Sheriff actually has a policy prohibiting any use of benzodiazepines in the Jail, even for "therapeutic purposes." Plaintiffs allege that "[s]udden cessation of [Xanax] is highly dangerous, and [it] was widely known at the time that abrupt disruption of [Xanax] lead[s] to seizures, and many other dangerous side effects. . . . These known and foreseeable symptoms are routinely avoided by tapering the patient off of the medication, under physician supervision, preferably in a hospital setting." In fact, Plaintiffs allege that "[t]he Galveston County Jail was cited six years ago for not dispensing medications ordered by a doctor." Plaintiffs allege that other inmates have also been denied their prescription medications, even if such medications cannot be safely discontinued without tapering down dosages under medical supervision.

Once Jacobs was in the Jail, he was placed on a "detoxification protocol" that Plaintiffs allege was a dangerous wholesale denial of his prescribed medication, and, as a direct result, he began to suffer serious withdrawal symptoms that went wholly untreated for a period of time. These symptoms included sleep-deprivation, elevated blood pressure, and a racing pulse, as well as "profuse sweating, disorientation, delirium tremens, palpitations, nausea, panic, anxiety, vomiting, diarrhea, metabolic failure, renal failure, respiratory failure, shock, as well as other symptoms." On his second day in custody, Jacobs was prescribed two medications without explanation, but he was never given a mental health screening or seen by a psychiatrist.

After his fourth day in custody, on March 10, 2015, while experiencing diarrhea, heavy sweating, and delirium tremens, Jacobs suffered a "Grand Mal" seizure, despite having no prior history of seizures. Plaintiffs allege that Jacobs was given only water and Gatorade. The next day, he suffered another seizure and he bit through his tongue, causing "heavy bleeding," and he was severely disoriented.

After this second seizure, Jacobs was placed in solitary confinement and his clothes were removed. Plaintiffs allege that the cell was a "cement room with a raised concrete slab for sleeping, the room is without a toilet, sink, or shower, but only a drain in the cement floor of the room." Jacobs continued thereafter to suffer additional seizures, but jail personnel did not note these symptoms on the required paperwork. Plaintiffs allege that Jacobs did not receive any treatment for these seizures, or his other serious symptoms, until his sixth day in custody. After his third seizure, jail staff notified one of the jail physicians, but Plaintiffs allege that the physician did not even examine Jacobs in

4

person. Instead, he was prescribed the medication Librium, but it either was not given to him or it had no effect. Plaintiffs allege that Jacobs was then "left alone, in solitary confinement, without physician, psychiatric, or medical supervision." Plaintiffs allege that Jacobs experienced a fourth seizure, which was documented by jail personnel, but "no treatment to prevent future or active seizures" was administered.

Finally, on his seventh day in custody, Jacobs was found on the floor of his solitary jail cell, "unresponsive, drooling, without a pulse, surrounded by his own feces." After a period of delay, jail medical staff "eventually" called 911 and began chest compressions. The emergency medical team performed CPR, and Jacobs was transported to the University of Texas-Medical Branch ("UTMB") hospital in Galveston, where he arrived "critically ill," with a "grim" prognosis.

Jacobs died the next day. Although Sheriff Trochesset listed Jacobs' cause of death as "natural causes," the Galveston County Medical Examiner ultimately determined that Jacobs' cause of death was "abrupt discontinuation of long term Alprazolam medication."

### B.  Legal Theories Asserted

Plaintiffs assert a variety of legal theories, bringing claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, the Texas Constitution, and Texas law. Plaintiffs specifically allege that Jacobs' rights under the Fifth, Eighth, and Fourteenth Amendments were violated. Plaintiffs have sued Sheriff Trochesset in his individual capacity.

5

Plaintiffs allege that Jacobs' Eighth Amendment rights were violated in several ways. First, they allege that Sheriff Trochesset "implemented a policy to discontinue the administration of Alprazolam medication to any inmate that enters the Galveston County Jail," and that "the Galveston jail medical staff, including Dr. Linea McNeel, Dr. Teresa Becker, Dr. Harry L. Faust, Galveston jail medical staff, and other Galveston County Jail personnel allowed the discontinuation to continue and refused to administer [Jacobs'] legally prescribed non-narcotic medication, after his severe withdrawal symptoms became evident, not based on medical judgment, but because it was against jail policy to allow inmates to receive Alprazolam." Plaintiffs also allege that Jacobs was denied treatment for his medical complaints and symptoms, including seizures, and that jail personnel failed to monitor him in accordance with Texas Jail Standards, leaving him instead in a solitary cell "for hours upon hours without any medical treatment."

Plaintiffs further complain that any medical treatment for Jacobs' seizures was wholly inadequate and did not rise to the level of adequate medical care. Plaintiffs contend that the remainder of Jacobs' other, very serious, symptoms went completely untreated. Next, Plaintiffs allege that at least one of the physicians and pharmacists that the Jail hired to care for inmates has been disciplined by the Texas Medical Board, and this doctor is currently under investigation by the Texas Medical Board. Plaintiffs point out that the County Jail lacks an infirmary unit, even though such an infirmary unit is required by the Texas Administrative Code. After Jacobs' death, Plaintiffs allege the Galveston County Jail failed an inspection by the Texas Commission for Jail Standards because of inadequate inmate supervision.

6

Plaintiffs contend that the Sheriff and the County were deliberately indifferent to the serious medical needs and the risk to inmates such as Jacobs and the likelihood that they would experience dangerous withdrawal symptoms without adequate medical attention available. Plaintiffs contend that the Sheriff and the County failed to train staff and implement jail policies, practices, customs and usages that adequately addressed the obvious and known health and safety risks, and that other inmates had suffered harm in the past. They allege that the Sheriff "personally directed and encouraged the 'detoxing of inmates' on any Alprazolam regimen, including Jesse Jacobs" and that the Sheriff "was personally involved in or had direct responsibility for actions of Jailers and medical personnel including physicians, nurses, EMT who knew of Jesse Jacobs' injuries and refused to help him." Plaintiffs specifically allege that the Sheriff discouraged jail staff, including medical staff, from calling 911 in order to save money.

Plaintiffs allege that the Sheriff and the County violated the ADA and Section 504 because Jacobs was a qualified person with a documented disability of mental illness, who requested a reasonable accommodation. Plaintiffs allege that Jacobs was "discriminatorily denied and deprived of the reasonable accommodations, specifically, he was discriminatory deprived of his medication, Alprazolam and was not transported to a hospital after suffering his first three seizures in the Galveston county Jail, although there was no burden that could be demonstrated by the Galveston County Jail."

As damages, Plaintiffs seek punitive damages against each individually named Defendant, as well as actual damages, compensatory damages, and damages for mental anguish Jacobs suffered before his death, loss of inheritance, pain and suffering, and

attorney's fees. Plaintiffs also seek equitable relief, requesting that "Galveston County and Sheriff Trochesset be made to apologize and to promulgate, adopt, train, maintain and enforce appropriate policies to prevent future instances of the type of misconduct described herein."

### C.  Pending Motion to Dismiss

Sheriff Trochesset contends that the Plaintiffs' claims against him are insufficient to defeat his qualified immunity as a public official. He also argues that the ADA and Section 504 claims against him should be dismissed. Finally, he asks that this Court either dismiss the state law claims against him on the grounds of official immunity, or remand any remaining claims under Texas law to state court.

## APPLICABLE LAW

### A.  Federal Rule of Civil Procedure 12(b)(6)

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id*.

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; accord *Iqbal*, 556 U.S. at 678 (noting that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

In conducting this analysis, the Court does not consider legal conclusions as true, and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### B. Eighth Amendment Right to Medical Care

Under the Eighth Amendment, conditions of confinement must be "humane" and "must not involve the wanton and unnecessary infliction of pain." *Palmer v. Johnson*, 193 F.3d 346, 351–52 (5th Cir. 1999) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), and *Farmer v. Brennan*, 511 U.S. 825, 832, 114

S.Ct. 1970, 128 L.Ed.2d 811 (1994)). This means that there is no question that "prisoners are entitled to receive 'adequate . . . medical care.'" *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013) (internal citations omitted).

A plaintiff who seeks to allege a deprivation of adequate medical care must first allege "objective exposure to a substantial risk of serious harm," and then that "prison officials acted or failed to act with deliberate indifference to that risk." *Gobert v. Caldwell,* 463 F.3d 399, 346 (5th Cir. 2006) (quoting *Farmer*, 511 U.S. at 847). As to the first prong, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). As to the second prong, a prison official acts with "deliberate indifference" when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citations omitted).

The Fifth Circuit has repeatedly stated that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Rogers,* 709 F.3d at 409. Additionally, "the decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" *Id*. Instead,

10

"deliberate indifference" requires a prisoner to allege that prison officials "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Id*. Similarly, "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that results in substantial harm." *Easter*, 467 F.3d at 464 (quotation omitted); *but see Coleman v. Sweetin*, 745 F.3d 756, 766 (5th Cir. 2014) (plaintiff alleged deliberate indifference where he alleged substantial harm due to defendant's persistent refusal to answer his "sick-call request slips" or provide pain medication even when he was in so much pain that he was unable to lie down in bed or use toilet properly).

Unquestionably, "[d]eliberate indifference 'is an extremely high standard to meet.'" *Gobert*, 463 F.3d at 346 (internal citations omitted). But it is not impossible. Ignoring or refusing to treat medical complaints can be "deliberate indifference." *See Easter v. Powell,* 467 F.3d 459, 464 (5th Cir. 2006) (prisoner alleged that defendant refused to follow a prescribed course of treatment even though defendant was aware that prisoner had a medical condition that posed a substantial risk to his health); *Coleman,* 745 F.3d at 765 (prisoner's allegations that he informed prison officials that he had fallen multiple times and his hip was broken, but officials did not follow up or report his alleged statements, sufficiently alleged deliberate indifference); *Perez v. Anderson*, 350 Fed. App'x. 959, 962 (5th Cir. 2009) (vacating dismissal of Eighth Amendment claim where "Perez's allegations suggest that jail officials knew about his persistent pain yet delayed treatment by a physician for a substantial period").

By the same token, medical attention may be so deficient that it amounts to deliberate indifference. Although courts will not second-guess medical decisions, an official cannot immunize himself in every case by simply pointing out that a nurse or doctor reviewed a file or spent a few moments with a prisoner.[3] At some point, the line between regrettable medical negligence and constitutionally inadequate medical care is crossed.[4] *See, e.g., Criollo v. Milton*, 414 Fed. App'x. 719, 721 (5th Cir. 2011) (vacating district court's dismissal of complaint because allegations that nurse failed to follow instructions outlining prisoner's prescribed treatment were sufficient to allege deliberate indifference rather than mere negligence); *Shepherd v. Dallas County*, 591 F.3d 445, 453 (5th Cir. 2009) (finding a constitutional violation where "the jail's evaluation, monitoring, and treatment of inmates with chronic illness was, at the time of Shepherd's stroke, grossly inadequate due to poor or non-existent procedures and understaffing of guards and medical personnel"); *Monceaux v. White*, 266 Fed. App'x. 362, 364 (5th Cir. 2008) (affirming denial of summary judgment where plaintiff's wound was treated over five days by five nurses who each "cleaned the area, applied an antibiotic ointment, and bandaged his thumb," but who failed to notify doctor, even though "[the] thumb became progressively worse"); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (defendant's

---

[3]    *See, e.g., Suffal v. Jefferson Parish,* CIV. A. 14-2478, 2015 WL 631452, at *3 (E.D. La. Feb. 13, 2015) ("Defendants may not escape liability merely by providing some treatment to Suffal, if Defendants' failure to provide additional treatment constitutes deliberate indifference.").

[4]    *See, e.g. King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012) ("In evaluating the evidence, [courts] must remain sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment.").

failure to call an ambulance for almost two hours while plaintiff lay unconscious and vomiting rose to level of deliberate indifference); *Lawson v. Dallas County*, 286 F.3d 257, 259 (5th Cir. 2002) (paraplegic prisoner established inadequate medical care, even though he repeatedly interacted with jail doctors and nurses, had his dressings changed repeatedly, and received basic medical attention).

Courts have found it even more "troubling" when a plaintiff alleges that a jail policy imposed by administrators impacts medical treatment and care, such as a policy imposing a blanket ban on certain prescribed medications without appropriate medical advice and oversight. *See, e.g., Treadwell v. McHenry County, Illinois*, 13 C 50077, 2016 WL 4394514, at *5 (N.D. Ill. June 20, 2016) (denying defendants' motion for summary judgment on qualified immunity, noting, "It is undisputed that Treadwell came into the jail with a valid prescription for Klonopin and that CCS's policy required that Treadwell be taken off of the benzodiazepine and did not provide either an independent medical examination prior to making that decision or a replacement to treat Treadwell's Tourette's Syndrome.").

### C. Section 1983

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds*, *Daniels v. Williams*,

474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995). A complaint under § 1983 must also allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Plaintiffs suing public officials under § 1983 must file short and plain complaints that must be factual and not conclusive. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).

### D. Individual and Supervisory Liability under § 1983

Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983. *See Jones v. Lowndes County, Mississippi*, 678 F.3d 344, 349 (5th Cir. 2012) ("A Section 1983 claimant must 'establish that the defendant was either personally involved in the deprivation or that his wrongful actions were causally connected to the deprivation.'"); *Zarnow v. City of Wichita Falls, Texas*, 614 F.3d 161, 169 (5th Cir. 2010) ("To support a supervisory liability claim, the misconduct of a subordinate must be conclusively linked to the action or inaction of the supervisor."), *cert. denied*, 564 U.S. 1038 (2011).

However, a supervisor not personally involved in the acts that allegedly deprived the plaintiff of his constitutional rights can still be liable under § 1983, if (1) the supervisor failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *See Estate of Davis ex rel. McCully v.*

*City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005); *see also Morgan v. Texas Dep't of Criminal Justice McConnell Unit*, 537 Fed. App'x. 502, 509 (5th Cir. 2013) ("A defendant . . . may be held liable for his or her role in a constitutional violation premised on [his] conduct as a supervisor, for example, his or her failure to train."); *Martone v. Livingston*, No. 4:13–CV–3369, 2014 WL 3534696, at *7 (S.D. Tex. July 16, 2014) (Plaintiff could hold TDCJ prison officials liable in supervisory capacity for "creating and approving the dangerous conditions that caused [Plaintiff's] heat stroke, and failing to remedy them.").[5] Further, "[s]upervisory liability may additionally exist 'without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'" *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 289 (5th Cir. 2002). Under this analysis, customs or widespread practices are akin to official policies. *Cozzo*, 279 F.3d at 289.

### E.  Qualified Immunity Under Federal Law

Under federal law, public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 106 S.Ct. 1092, 1096 (1986); *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009). As a result, courts will not deny qualified immunity unless

---

[5] In this context, "a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'" *McCully*, 406 F.3d at 381.

15

"existing precedent . . . placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). In conducting a qualified immunity analysis, each defendant's conduct must be examined individually. *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

Although qualified immunity is an affirmative defense, a plaintiff "has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery,* 569 F.3d 214, 217 (5th Cir. 2009). A plaintiff can meet this burden by alleging facts showing that the defendant committed a constitutional violation and that the defendant's actions were objectively unreasonable in light of the clearly established law at the time those actions were taken. *Atteberry v. Nocono General Hosp*., 430 F.3d 245, 253 (5th Cir. 2005). To be "clearly established," the law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, ⸺ U.S. ⸺, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015). The Fifth Circuit has taken pains to point out that the "objectively unreasonable" analysis here is not the same as the "deliberate indifference" analysis seen in the Eighth Amendment context above—"[o]therwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Hinojosa v. Livingston*, 807 F.3d 657, 672 (5th Cir. 2015).

As the Fifth Circuit has explained, "[a] plaintiff seeking to overcome" a defense of immunity to suit "must plead specific facts that . . . allow the court to draw the reasonable inference that . . . defeat[s]" the defense. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir.

2012) (regarding qualified immunity). Only "[a]fter the district court finds a plaintiff has so pled, if the court remains 'unable to rule on the immunity defense without further clarification of the facts,'" may it issue a "narrowly tailored" discovery order. *Id.; see Wicks v. Miss. State Emp't Svcs.*, 41 F.3d 991, 994 (5th Cir. 1995) ("Discovery . . . must not proceed until the district court first finds that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity.").

## ANALYSIS

As noted above, this Memorandum Opinion and Order addresses Sheriff Trochesset's affirmative defense of qualified immunity and his motion for dismissal under Rule 12(b)(6) on the grounds of that qualified immunity. Sheriff Trochesset contends that he is entitled to dismissal on the grounds of qualified immunity because (1) Plaintiffs have wholly failed to allege the violation of any constitutional right, and even if they have, (2) his actions were objectively reasonable in light of clearly established law.

Plaintiffs have alleged that Sheriff Trochesset violated Jacobs' Fifth, Eighth, and Fourteenth Amendment rights. The Court finds that Plaintiffs' factual allegations fail to state a claim under the Fifth and Fourteenth Amendments. *See, e.g. Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000); *Hines v. Henson*, 293 Fed. App'x. 261, 263 (5th Cir. 2008) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)). Accordingly, the Court **GRANTS** the motion to dismiss Plaintiffs' claims against Sheriff Trochesset under the Fifth and Fourteenth Amendments.

The Court now turns to the Eighth Amendment claims. First, do Plaintiffs sufficiently allege that Jacobs was exposed to a substantial risk of serious harm? The Sheriff does not argue otherwise.

Next, do the Plaintiffs sufficiently allege that the Sheriff acted or failed to act with deliberate indifference to the risk that Jacobs faced? Sheriff Trochesset candidly admits that "[d]eliberate indifference to known withdrawal symptoms may state a claim [under the Eighth Amendment]." Relying on the Fifth Circuit's opinion in *Pedraza v. Meyer*, 919 F.2d 317, 318 (5th Cir. 1990) (per curiam), he seeks to distinguish that case from Plaintiffs' allegations and the Eighth Amendment cases cited above. He contends that Plaintiffs' Third Amended Complaint, including the documents that Plaintiffs have submitted as exhibits to their Complaint, show that Jacobs received "constant" medical attention from jail personnel during the entire length of his incarceration, and he further contends that Plaintiffs are simply unsatisfied with the quality of the medical care he received. Thus, he argues, Plaintiffs' allegations do not rise to a level of "deliberate indifference."

Finally, do Plaintiffs sufficiently allege that Sheriff Trochesset's alleged actions or failures to act were objectively unreasonable in light of the clearly established law at the time? The Sheriff contends that all of his alleged actions, particularly the alleged policies of prohibiting Xanax without proper medical supervision and discouraging jail staff from calling 911 even in instances such as the one alleged by Plaintiffs, are objectively reasonable.

18

However, after considering the Third Amended Petition, as well as the Fifth Circuit's governing precedent and instructions in cases such as *Backe v. LeBlanc*, 691 F.3d 645 (5th Cir. 2012), the Court finds the Plaintiffs have alleged enough specific facts to allow the Court to draw the reasonable inferences that Sheriff Trochesset may be liable for the harm alleged, and further, that those alleged facts defeat his claims to qualified immunity. However, the Court is ultimately unable to rule on the issue of the Sheriff's qualified immunity without more facts. Accordingly, the Court will deny Sheriff Trochesset's Rule 12(b)(6) motion on the issue of his qualified immunity, because a Rule 12(b)(6) dismissal is not appropriate at this time. The Court finds that limited discovery in this case is appropriate.

This limited discovery should be tailored to the personal knowledge and personal conduct of Sheriff Trochesset. Specifically, the limited discovery should be directed at the following factual issues:

- whether the Sheriff implemented a policy or custom of prohibiting the administration of prescription benzodiazepine medication to inmates, the details of that policy or custom, and the training jail employees and staff receive regarding that policy or custom;

- whether the Sheriff implemented a policy or custom of discouraging jail employees or contractors from calling 911 to respond to prisoner medical emergencies, the details of that policy or custom, and the training jail employees and staff receive regarding that policy or custom;

- the Sheriff's knowledge of, or reason to suspect, a risk of harm to inmates posed by a policy or custom of prohibiting the administration of prescription benzodiazepine medications to inmates in the Galveston County Jail;

- the Sheriff's knowledge of, or reason to suspect, a risk of harm to inmates created by a policy or custom of discouraging jail employees from calling 911 to respond to prisoner medical emergencies;

- the Sheriff's knowledge of, or reason to suspect, a risk of harm to inmates posed by inadequate medical care for or supervision of benzodiazepine withdrawal symptoms;

- evaluations, investigations, reviews, or critiques regarding the adequacy of medical care provided to inmates complaining of benzodiazepine withdrawal symptoms, seizures, or untreated panic disorder in the Galveston County Jail within the last 6 years;

- complaints from prisoners, other individuals, or advocacy groups regarding the adequacy of medical care provided to inmates complaining of benzodiazepine withdrawal symptoms, seizures, or untreated panic disorder in the Galveston County Jail within the last 6 years;

- Sheriff Trochesset's knowledge regarding the incarceration of Jesse Jacobs, including any communications or reports with jail employees or contractors regarding Jacobs' request for his prescription medication, and his medical symptoms and medical treatment during incarceration; and

- the names of any jail employees or contractors who supervised or interacted with Jacobs from March 6, 2015, through his time of death.

This limited discovery may include the depositions of Sheriff Trochesset, as well as requests for production of documents and tangible or electronic items related to the above issues. This limited discovery may also include a request for production of, and discovery regarding the care, custody, and control of, any video or photographs of Jacobs during his incarceration. It is preferred that, if possible, discovery be conducted via interrogatories and other written methods, and that depositions be noticed only if necessary and upon the least intrusive terms possible.

## CONCLUSION

In light of the foregoing, for the reasons stated above, the Court **GRANTS** Sheriff Trochesset's motion to dismiss Plaintiffs' Fifth and Fourteenth Amendment claims against him, but **DENIES** Sheriff Trochesset's motion to dismiss the claims against him on the grounds of qualified immunity, and the Court **ORDERS** that limited discovery should proceed in accordance with this Order.

SIGNED at Galveston, Texas, this 2nd day of November, 2016.

George C. Hanks Jr.
United States District Judge